The next matter, number 24-1009, United States v. James Ward Jackson. At this time, would counsel for the appellant please introduce himself on the record to begin. May it please the court, John Calcagney on behalf of the appellant, James Ward Jackson, may I please reserve three minutes for rebuttal. Yes, you may. Thank you, your honor. The appellant comes before the court today asking for a review of a trial court decision denying a motion to suppress that challenged a general search warrant that failed to meet the particularity requirement of the Fourth Amendment. As the court knows, this case involved a child pornography investigation. And at the conclusion of that investigation, a local state court authorized a search warrant for the generalized search of a large property which consisted of a church and an adjacent church rectory which contained multiple residents. When you say multiple, you mean up to three? Up to three could be assigned at any given time, your honor. At the time that this particular case or the execution of this particular warrant occurred, there were two priests in residence. So three would be the maximum allowable at the time. Multiple offices, multiple residents, and any and all digital devices to be located there within without specifying or particularizing the nature of the device, the location of the device to be located, or the person who would be responsible for owning the device. What's important to note about these types of investigations, child pornography investigations, is that normally speaking, an investigator receives information of an electronic transmission of a known child pornographic image. And in this particular case, they were able to trace the transaction of the file or the electronic image to a particular IP address that was hosted and maintained by a particular Internet service provider, registered with that provider, and assigned in the name of an administrator for the St. Mary's Church in Providence. Is that IP address for the router or for the actual device? The IP address, your honor, would have been for the router that was located at the church. And the investigation revealed that that particular router could be accessed within 150 feet of distance in terms of the range of the signal. But the router provided wireless and wired Internet service to anybody within range, and presumably was available to the residents that lived in the rectory, namely the two priests, the administrator mentioned by name in the brief, along with any visitors or parishioners. In this particular case, the warrant itself acknowledged that the rectory was occupied by multiple residents. The police detective in this case had actual knowledge that there were multiple people that lived in the rectory. On the second floor were the residents for the individual priests. The pastor, who at the time was in fact James Wood Jackson, had a personalized residence within the rectory that was under lock and key. It consisted of a private living quarter. So they had narrowed it down, right, that the downloads were happening in non-off hours, so to speak, right, when there wouldn't be a lot of people around. Yes, your honor. So they've narrowed it down then, presumably at least from a probable cause thinking, to two potential people who are living in a rectory that is common space, except for maybe they have locked bedroom doors, maybe. Well, at the time of the search warrant execution, all the officers knew is that there were multiple residents and employees that... When you say residents, they're living in the same place, but it's not an apartment building. It's a rectory with common space and then identified bedrooms. It has, I would characterize them differently. There were offices on the first floor along with common space, accessible and available to any occupants of the building, whether they be employees, parishioners, or residents. And then the second floor, your honor, to more accurately address your point, is the residents were located upstairs. I wouldn't characterize them as just as bedrooms, because the pastor's living quarters consisted of not only the bedroom, but also a private bathroom and a private office. And these were three sort of adjoining rooms that were under lock and key. And when the warrant itself did not set forth with any particularity as to what residents within the rectory was to be searched, it just applied to the entire church property as a whole. We've got several endpoints that I think there's agreement on, that if it's a single-family house, then there'd be no problem with a warrant upon probable cause authorizing a search of any devices within that house. Conceded. If it's a multi-unit apartment building with a whole bunch of people living in it in their own apartments, no good. You can't go search everybody, every apartment in that building. So we've got those two endpoints. We've got a spectrum in between. Then there are two people, which is what we have here, three, big unit, whatever, different types of living arrangements. What case law would you point us to that would say that this one is more like the multi-unit and therefore prohibited as opposed to more like a single-family house? Because I think if I understand your argument correctly, you need to convince us that it was clearly established at the time this warrant was given such that no officer could in good faith rely on it. Well, at the time the warrant was given, I don't believe that the officer who executed it or the judicial officer who approved it had knowledge as to how the interior of the church rectory was laid out. I think that when the officer got on scene and they began to execute the warrant, that it would have then become very apparent that they were dealing with multiple residential areas within the rectory itself. I do agree with the court that the single-family home and the multi-family home serve as the endpoints on this continuum. And I would suggest to the court that the church rectory doesn't fit neatly into either particular category. How is it different than a house with adult children that have their own rooms with their own bathrooms, they have keys to lock the doors, but otherwise they share the kitchen, they share the common area. And other than the fact of not being related, how is this different than that? I'm glad you brought up that point. I think that utilizing the hypothetical that Your Honor offered really highlights the fact that we need to look to the relationship of the parties. Presumably in a single-family home where people do maintain their own individual bedrooms, the courts can conclude, and we know from our life experience, that the occupants have complete access and control to just about all the areas of the home. When you look to another analogy that I'll give the court, a rooming house situation or a college dorm where there are other common areas but there are separate bedrooms or suites or living areas under lock and key, everyone has their own individualized expectation of privacy because the relationship of the parties living there are just fellow students. The boundary access is different. So in an apartment building, that's the door to the entrance. It's locked. There's a certain barrier to entry that I would think you can't say always, but often in this kind of scenario, bedrooms are left unlocked. Things can be brought in when the person's not there. It's a much more fluid kind of living situation even if you have locks, but it's different than an apartment building where that is not my apartment, the front door is locked. It is different, but it's because of the familiarity of the parties or the relationships among them. Priests that are living in-house together or assigned to a particular parish are not related by blood. They typically develop a friendship over time. When you serve for the church, it's kind of like teaming up. What is the case, let's say, about the frat that kind of cut you off, but I guess I'm interested. In a fraternity situation, what's the case? I haven't seen a case that speaks to that particular point, but I would think that if you're thinking of a frat house, I was just suggesting a college dorm environment. I think that when individuals go to – I don't know what the living situation would be like in a frat house, but if everybody had an individualized bedroom that was under lock and key, you may need to look at that particular circumstance as more akin to an apartment than a single family. In this particular case, the trial judge concluded in his decision that there was insufficient facts in the record for him to conclude whether or not the church rectory had more hallmarks that would make it more akin to a single family versus a multifamily, basically did not address the merits of the particularity argument. Well, suppose I'd like to take you back to the good faith question. Go back to the time you were in the court and you said the court needs to assess the merits and compare these two, and the court turns to you and says what I'm saying now, what precedent, ideally a Supreme Court or the First Circuit or some circuit, what precedent provides a clear answer to how this situation would be treated? I would suggest to the court that there are a number of cases out there that talk about the importance of the particularity clause, the justification for it. Sure, but it's the application of that concept. I think we've established we have somewhat of a spectrum here. You want us to say that this situation is more like the multiunit. Is there any case that you would point to that would establish it so clearly that the officers could be said not to have acted in good faith in relying on the warrant? I think it's a case-by-case factual-based analysis that could have been fleshed out had the court entertained an evidentiary hearing. So is there no answer to Judge Keada's question that you have no case that would point us in the right direction? I have not found a case, Your Honor, that is fact-specific and analogous to this particular case, but the brief that we submitted contains an abundance of legal support regarding the arguments that we've put forth. Your Honor, I think, Judge Keada, you were just about to ask about the application of the good faith, the Leon Doctrine. Essentially, in our brief, we point to two exceptions to the exception to suggest to the court that Leon shouldn't save the day. This was an absolute exploratory search for every nook and cranny of that residence, of that rectory, which consisted of multiple residents for any and all digital devices that could be seized and held in accordance with the warrant for weeks or months to be further searched to determine if there's any child pornography. This is exactly what the Fourth Amendment Particularity Clause was designed to protect against, and we hope that the court will overrule the lower court decision or at the very least remand for an evidentiary hearing on this point. Thank you. Judge Sellier, do you have any more questions? Thank you. Thank you. Thank you, counsel. At this time, would counsel for the United States please introduce herself on the record to begin? Good morning, Your Honors. May it please the court, Julie White on behalf of the United States. I'd like to spend my time addressing two of the issues that have been raised here in front of the court and stand on my brief on the remaining issues. One of the first topics, and I believe it's important, is defense counsel has conceded that the search warrant at the time it was signed was sufficiently particular given the facts that he had. And so I'd like to focus my attention on his second argument that he just made, Your Honors, that at the time the search warrant was executed, that was where the officers ran afoul of the particularity requirement. And I can tell the court that there's no evidence in the record to support that claim. The record is clear that the officers in this case took a reasoned, cautious approach to this case. And I won't belabor the point of all of the steps that they took to narrow down this, but it is important to know that the officer did not just simply find an IP address trading in illegal activity. He traced that IP address back to the St. Mary's Rectory, the home for the priest. But he didn't stop there. He then took that and he went and determined when this behavior was happening. And as the court alluded to a few moments ago, determined that that activity was happening during off hours of the church, when the church wasn't saying mass, when they weren't holding confirmation classes, at a time that the defendant concedes in his brief would be a time that someone like a priest was more likely to be using that IP address. And then the detective went further and he went to the church and he determined that that IP address was accessed by using a secured, password-protected Wi-Fi. And so while defense counsel argued... So what he says, though, is more could have been done. And the key thing that wasn't done is there were ways to figure out which device was actually downloading the material and that that would have really particularized it. Why is that not something that needs to be done? Well, Your Honor, I don't think that was capable of being done in this case. The case file that I'm familiar with where you were able to determine a specific device came from data from the application that was being used to trade the child pornography. In this case, the officers didn't have access to the peer-to-peer network beyond the IP address to determine anything about the specific devices that were being used. When you say IP address, the router has an IP address, as I understand it, but the device itself also has an IP address. Well, if I may explain a little bit, Your Honor, I think I can clarify that. The Wi-Fi network at the church was secured and password-protected. That was the only way to access this IP address that was trading child pornography. So while I may have a Wi-Fi network at home that has an IP address, my cell phone, if I was using data, would have a different IP address, and I think that may be what Your Honor is referring to, that differentiation between devices and access. Yes, and following up on Judge A. Frank's question, they had the router IP address, which created the problem because several people could be using the router. I take it it's your position that they could not reasonably get the IP address of the device that was accessing the router with the material of concern? So the IP address that the device was using was the IP address associated with the wireless router. It wasn't using its own IP address? No, sir, not to my understanding of how that technology works. What the information the detective had was that this IP address was trading child pornography on a peer-to-peer file sharing network. When they traced the IP address back, they found that it resolved to the church's rectory, and they further found that any user who had the password could only utilize that IP address by getting on to the secure password-protected network using the password. I take it there's no expert testimony on the subject that we're talking about, on which it sounds like neither one of us has any particular expertise? Well, Your Honor, I don't think in this case there was any testimony taken about this sort of technology. And so in applying for the warrant, should there have been some material supplied to the judge that explained that it was not reasonable to require something more be done to obtain with specificity which device was using the router? Your Honor, I think that the judge's knowledge in dealing with presumably hundreds of search warrants over the course of their career and dealing with the Internet and child pornography investigations would give him that knowledge. And certainly the detective supplied all of the information that he had to the magistrate in order to present the facts for the court to make a determination. And that sort of dovetails into our good faith argument, which is we tell law enforcement, do your investigation, work as far as you can, gather as much information as you reasonably can without tipping off a suspect, and then take your facts to a neutral, detached magistrate judge and ask them for a determination of probable cause before you proceed. And that's exactly what the detective in this case did. He presented all of the information that he had to the state court judge who then made a determination on probable cause. And Detective Evans and his team then relied upon the judge's determination of probable cause and they executed the search warrant. Let me ask you this. As I understand the factual record presented to the magistrate, the odds are reasonable that there was some person within the rectory that was accessing that router and so was the proper subject. But it seems the odds are also very high that there was another person there who was not. They just didn't know which was which. The warrant authorizes the seizure of both persons' devices. So we're talking about it's virtually certain that the execution of the warrant is going to go to an innocent person and take their phone, their iPad, their laptop, whatever. That's a pretty big impact on someone to suddenly have all their devices taken away. And there seems to be no precautions taken to determine quickly which is which and return them. Is that a concern? Well, I have two responses to that, Your Honor. The first one would be this is exactly the scenario the court approved in McClellan where you allowed the search of an entire dwelling of three individuals knowing the probability was only one of them engaged in this illegal conduct. That's exactly what we have here. And I can tell the court that there are precautions in place and they're evidenced by the fact that the only electronic devices that were seized, to my knowledge in this case, were the defendants with the illegal child pornography on it. When they execute search warrants like this, Detective Evans and his team often preview the devices to make sure that they are only taking what is reasonably necessary to further their investigation into the illegal conduct. And my question is shouldn't the warrant require that to be a proper warrant? Well, Your Honor, I don't think that there's case law requiring that. I think that that's the best practice that the officers use. And in this case, we don't need to reach that issue because that's exactly what they did. To address one additional topic that Defense Counsel has raised here today was the idea that when Detective Evans and his team executed the search warrant was when they ran afoul of the particularity requirement. And presented before you today is this idea that when the officers entered the residence at the rectory, they should have immediately known it was a multi-unit dwelling and they should have stopped. Now, Your Honors, I would agree that if there was a multi-unit dwelling, or if there was any reasonable indication there was a multi-unit dwelling, that would be a correct statement of the law. But there's nothing in the record to support that. Simply nothing. Well, there's a suite that's a bedroom and a bathroom, I presume it's a door that locks. They would say that shows it's a multi-unit dwelling. Well, Your Honor, that I would say is the epitome of a quintessential New England dwelling with a primary bedroom and attached bathroom. It's actually very similar to what I have at home. And like many other residences, there are several additional bedrooms and a hallway bathroom. There's also a kitchen, a living room, and a dining room. That is a primary bedroom in my estimation, but more importantly than my estimation, when Detective Evans and his team showed up on the scene, they reasonably made that interpretation of what they were seeing in front of them. They didn't see multiple doorbells. They did not see multiple mailboxes. They weren't seeing unit numbers either inside or outside of the residence. They weren't seeing any individual compartmentalized residential setup designed for independent living. There's nothing to show that in the facts of this case. Instead, it's a single family dwelling with presumably two occupants. Very similar to McClellan, where we had three occupants. One was renting a room, and the court upheld the search of that residence, finding that the warrant was sufficiently particular because the items to be seized could have been found anywhere in that residence. So the defendant would say, or said, I think, that the thing we should be focused on is the relationship of these people. So he knew these people have no other than a business sort of relationship. They have no relationship. He knew that when he went in. He saw different bedrooms. He knows this is not a family. These are not college roommates. These are work colleagues. That should make it different. That's what the defense would say. Why is that wrong? Sure, because there's no facts in the record to support that. No, there are facts in the record. He knows it's a church, a rectory, and these are priests that are living there. Those are the facts he would rely on. Yes, that's true, Your Honor, but there's no fact to show that these were simply business colleagues. We don't even know the name of the second priest. And so to presume that these were simply two individuals who had nothing to do with one another, I'm not confident that my interpretation of the record supports that. But I would point again to this court's own precedent and the directive you've given to law enforcement officers, and McClellan seems to be so very close to the facts that we have here today. In McClellan, there were two individuals and a room that was being rented. That goes farther towards, and on the continuum that you've drawn, it goes farther away from what we have. And in that case, this court told law enforcement officers that was a reasonable search warrant written with sufficient particularity to comport with the requirements of the Fourth Amendment. And so we would proffer to the court that this search warrant is very similar for a rectory, which is the home for the priest. There may have been two priests living there at the time. Certainly Father Jackson was living there at the time. And when that search was executed, the officers went upstairs and started searching the bedrooms. They found Father Jackson's bedroom. They found his password-protected laptop. And that password-protected laptop was connected to the secure password-protected Wi-Fi that allowed you to use the IP address, the same IP address that was trading in this illegal child pornography. And on that laptop were tens of thousands of images of child pornography. Detective Evans and his team did exactly what the state court judge told them that they could do to the anticipated end, which in fact turned out to be true. And so for those reasons, we would ask that this court affirm the district court's decision and uphold the search warrant in this case. Are there any additional questions, Your Honors? Judge Salia? We're all set. Thank you. Thank you, Your Honors. Thank you, Counsel. At this time, Counsel for the Appellant has a three-minute rebuttal. Thank you. Just two very quick points. First, to respond to Judge Ephraim's exchange with my sister about whether or not another priest lived there at the time. Addendum at 36 is an affidavit from Father Tronck, who attests to the fact that he was in residence there with Father Jackson, then Father Jackson, at the time of the warrant execution. And the last point, just to address Judge Kayada's exchange with my sister about the router. The routers, Your Honor, have an IP address, as you know and have acknowledged. And every digital device that we have, computers, phones, tablets, have their own electronic serial number. And that registers when there's a connection with the router. And the suggestion in my brief that what police could have done in this case was gotten a warrant for the router, determined the electronic serial numbers of the devices, and then begun to narrow down the focus so that they could have applied for a warrant that with greater particularity described the things that you see. I did this work previously, and I had never heard of that. Do you have cases where that's been discussed as a required thing to do when it comes to a CP warrant to focus in on that level of detail? Absolutely not. There are no cases on it. But the court, Judge Ephraim, I assume you're acknowledging that the routers do create a record of the digital devices. I'm accepting what you say. I've never seen that done in practice. The way you get that, you subpoena that data or get a search warrant for that data, and then that takes you to the specific device. I haven't seen that, but you're describing it, and I was wondering if that's catching on as a thing that's required. I'm sorry. Is there any evidence in the record of this case that verifies that the procedure is as you've just stated it? No, Your Honor. No, Your Honor. There was never a hearing where these things could have been borne out. The trial court passed on the merits and went straight to the good faith, and that is particularly why we submitted the motion for reconsideration, at least with regard to submitting photographs and the affidavits to provide him with more characteristics of the building so that he could determine whether or not the rectory was more akin to the multifamily dwelling. But had there been a hearing, perhaps these issues could have been fleshed out greater. And my last remark, I've got 30 seconds, is that if law enforcement was in the practice of gaining access to the router as a way of finding out which electronic device was downloading or accessing at the given time that they already knew the electronic transmission took place, we could avoid these more exploratory searches or innocent persons, as Judge Kayada said, having their devices seized and searched. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.